**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

                    *Petitioner*,

    v.

THE CITY OF NEW YORK,

                    *Respondent*.

25 Misc. 559 (LAK)

**OPPOSITION OF THE CITY OF NEW YORK TO PETITION**
**OF THE UNITED STATES OF AMERICA FOR SUMMARY ENFORCEMENT**
**OF HSI ADMINISTRATIVE SUBPOENA NO. HSI-2026-001193-001**

SHER TREMONTE LLP
90 Broad St., 23rd Floor
New York, New York 10004
(212) 202-2600

*Attorneys for The City of New York*

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ........................................................................................................................... 3

███████████████████████████████████████████████

███████████████████████████████████████████████

III.    THE AUGUST 6 ADMINISTRATIVE SUBPOENA AND ITS
        SUBSEQUENT WITHDRAWAL.......................................................................... 8

IV.    THE AUGUST 22 SUBPOENA AND ITS SUBSEQUENT ABANDONMENT .......... 10

V.     THE CURRENT SUBPOENA, IN WHICH THE GOVERNMENT REVERTS
        TO THE FORM OF ITS RESCINDED AUGUST 6 SUBPOENA ................................ 12

LEGAL STANDARD................................................................................................................... 13

ARGUMENT................................................................................................................................ 14

I.     THE SUBPOENA IS UNREASONABLE AND DISPROPORTIONATE
        TO ANY LEGITIMATE INVESTIGATIVE PURPOSE ................................................ 14

CONCLUSION............................................................................................................................. 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*E.E.O.C. v. United Parcel Serv., Inc.*,
    587 F.3d 136 (2d Cir. 2009) ...................................................................................... 14

*Federal Trade Comm'n v. American Tobacco Co.*,
    264 U.S. 298 (1924) ................................................................................................. 14

*In re Admin. Subpoena No. 25-1431-019*,
    No. 25-MC-91324-MJJ, 2025 WL 2607784 (D. Mass. Sept. 9, 2025) .............................. 16, 19

*In re Apple, Inc.*,
    149 F. Supp. 3d 341 (E.D.N.Y. 2016) ........................................................................ 18

*In re Sealed Case (Admin. Subpoena)*,
    42 F.3d 1412 (D.C. Cir. 1994) ............................................................................. 14, 15

*Queerdoc, PLLC v. U.S. Dep't of Justice*,
    No. 25-MC-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025) ...................... 20

*RNR Enters., Inc. v. S.E.C.*,
    122 F.3d 93 (2d Cir. 1997) ....................................................................................... 13

*United States v. City of New York et al.*,
    No. 25-CV-4084 (RER)(PK) (E.D.N.Y. 2025) .......................................................... 19

*United States v. Powell*,
    379 U.S. 48 (1964) .................................................................................................... 14

*United States v. Vargas-Cordon*,
    733 F.3d 366 (2d Cir. 2013) ..................................................................................... 17

**Statutes**

8 U.S.C. § 1225 ................................................................................................................ 18

**Other Authorities**

*Consent Decree*, *Callahan v. Carey*, No. 42582/79 (N.Y. Sup. Ct. Aug. 1981), available at
    https://www.coalitionforthehomeless.org/wp-content/uploads/2014/06/
    CallahanConsentDecree.pdf ....................................................................................... 4

The City of New York respectfully submits this brief in opposition to the government's petition (the "Petition") for summary enforcement of HSI Administrative Subpoena No. HSI-2026-001193-001 (the "Subpoena").[1]

## PRELIMINARY STATEMENT

This Court should deny the Petition and decline to enforce the Subpoena as unreasonable and disproportionate to any legitimate investigative purpose. An agency's subpoena authority, while expansive, does not authorize a fishing expedition. Here, the government seeks to enforce an administrative subpoena that demands the names and dates of birth of *every* male resident of a single City shelter—1,921 people as of December 22, 2025. (Declaration of Sheryl Neufeld ("Neufeld Decl.") ¶ 4.) The government's purpose, as openly acknowledged in the Petition, is apparently to use that information to conduct a separate, post hoc investigation to determine whether any of those residents might be a non-citizen who has committed a "serious criminal violation[]." (Petition at 8.)

Notably absent from the Petition is any indication that any particular resident has entered the United States illegally or committed a criminal or civil offense of any kind. And while the government claims to be searching for individuals who "retain criminal histories" involving a laundry list of serious offenses, the Petition fails to identify even a single such individual. Nor does the Subpoena include a description of residents about whom the government has even generalized concerns. Instead, the government blithely demands a list of *all* residents, in the hopes of finding evidence of law-breaking later. The government's approach is akin to demanding a list

---

[1] Homeland Security Investigations ("HSI") is the investigatory arm of U.S. Immigration and Customs Enforcement's ("ICE"). *Who We Are*, ICE, https://www.ice.gov/about-ice (last visited Jan. 2, 2026). For simplicity and consistency, this Opposition refers to the operative agency as "ICE" throughout.

of all residents of an entire New York City block,[2] so that the government can use that list to investigate whether any of those residents committed an offense.  This is the very definition of an improper fishing expedition and an unreasonable and unlawful use of the administrative subpoena power.

While the Petition attempts to create the impression that the City is stonewalling the government's efforts at routine law enforcement, that impression is false.  In fact, as discussed below (*infra*, Argument Section I), the City has *complied* with a subpoena from these same agents that was more narrowly targeted to seek information about 79 named individuals who ICE believed to be "subject to final orders of removal, have open warrants, or have been convicted of criminal offenses since unlawfully entering the United States."  (Declaration of Douglas R. Jensen ("Jensen Decl.") ¶¶ 8–9.)  The City has consistently declined, however, to honor subpoenas that seek a census-level list of residents, and indeed the government has withdrawn such subpoenas in response to the City's objections.

While the Petition suggests that the City has taken this position only recently, in fact this dispute began much earlier, in March of 2025, ███████████████████████████████████ ████████████████████████████████████████████████████████████ the City moved to quash███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████ the government now seeks substantially the same information through an administrative subpoena.

---

[2]    One estimate holds that the average New York City block contains 1,400 residents—similar to the number of residents housed in the shelter at issue here.  *See How Many People Live on Just One Block in Manhattan*, VLESDESIGNS, https://vlesdesigns.com/blogs/facts/how-many-people-live-on-just-one-block-in-new-york (last visited Jan. 2, 2026).

If the current Subpoena is enforced, ███████████████████████████

███████████████████████████████████████████████████████████████

███████ there is no reason to believe that the government will stop there.  Other subpoenas,

seeking complete resident lists of other shelters, will surely follow.  The current Subpoena thus

represents the tip of the spear by which the government will likely seek to obtain resident lists

implicating the privacy interests of many tens of thousands of the City's residents.  Whatever the

strength of ICE's administrative subpoena authority, it does not extend that far, and its Subpoena

should be quashed.

## BACKGROUND

Although the government's Petition describes a small segment of the background that led

to the Subpoena, that description is incomplete.  This Subpoena is the latest in a long string of

unsuccessful and unlawful efforts to obtain broad census-level information on all individuals

residing in City shelters.  Although the Petition describes one predecessor subpoena—described

as the "Original Subpoena," (Petition at 4–6)—the government's campaign to obtain such

information stretches back much earlier, to at least mid-March 2025, ████████████████

██████████████████████████████[3]

█████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████████

---

[3] ██████████████████████████████████████ led to motions to quash heard
by the Honorable John G. Koeltl.  During the argument of those motions, Judge Koeltl directed
that the proceedings be sealed ██████████████████████████████████████
Accordingly, contemporaneous with its filing of this Opposition, the City will file a letter motion
for leave to file under seal █████████████████████████████████ and any
transcripts of the arguments before Judge Koeltl.  The motion also seeks leave to redact from its
Opposition any substantive references to those materials.

███████████████████████████████████████████████████████[4] ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

[4]    Under a 1981 consent decree entered in *Callahan v. Carey*, No. 42582/79 (N.Y. Sup. Ct. Aug. 1981), the City has a legal obligation to provide shelter for all homeless residents, whether citizens or non-citizens.    Available at https://www.coalitionforthehomeless.org/wp-content/uploads/2014/06/CallahanConsentDecree.pdf.





███████████████████

████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████

████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████

## III.    THE AUGUST 6 ADMINISTRATIVE SUBPOENA AND ITS SUBSEQUENT WITHDRAWAL

████████████████████████████████████

████ sought to compel the City to provide a list of shelter residents, although this time with an

administrative subpoena issued by ICE.[6] ████████ the City objected, and ████████—although the Petition fails to mention this fact, or even the existence of the subpoena—the government ultimately withdrew its subpoena.  (*Id.* Ex. 9.)

Specifically, on August 6, 2025, the Special Agent in Charge ("SAC") of the New York ICE HSI office directed an ICE administrative subpoena to counsel for the City.  (*Id.* Ex. 7.)  The August 6 subpoena sought a list of "all [non-citizen] males currently lodged or residing at" two City shelters—a shelter previously located at the "Row" hotel at 700 8th Ave, New York, NY and the Bruckner shelter at issue in the current Subpoena located at 825 East 141st Street, Bronx, NY (the "Bruckner Shelter").[7]

As purported justification for this broad request, the letter explained that ICE "ha[s] received law enforcement reporting indicating that individuals housed at the Shelters have engaged in criminal behavior" and that "individuals at the Shelters are residing there despite having been ordered removed from the United States."  (*Id.* Ex. 7.)  However, the subpoena provided no details or support for these vague references to "law enforcement reporting."  Nor did the subpoena identify any residents that ICE believed to have engaged in criminal behavior or to be living in the shelters despite having been ordered removed from the United States.  (*Id.*)  The August 6 subpoena demanded a response by "8:00 AM" on August 11—less than three business days later.

---

[6]    Prior to issuance of the August 6 administrative subpoena, on or about June 3, 2025, the government issued a different administrative subpoena.  Unlike all the other subpoenas issued by the government in this matter, that June 3 subpoena was more narrowly targeted, providing a list of 79 individuals and seeking information about them.  (Jensen Decl. ¶ 8.)  Without conceding the enforceability of that subpoena, the City chose to provide a limited portion of the information sought.  (*Id.* ¶ 9.)

[7]    As of December 22, 2025, the Bruckner Shelter has approximately 1,921 residents, all of whom are single adult males.  (Neufeld Decl. ¶ 4.)

(*Id.*)  Further, the SAC's letter suggested that a failure to comply could expose the City to possible criminal prosecution for obstruction of an investigation and/or harboring illegal aliens.  (*Id.*)

On August 11, 2025, the City objected to the August 6 subpoena as improper and unenforceable.  (*Id.* Ex. 8.)  Among other things, the City's counsel wrote that "[i]f ICE HSI believes that there are individuals residing at the [named shelters] who have been ordered removed from the United States" as its letter stated, "it could have listed those individuals and requested appropriate information regarding those individuals in the [s]ubpoena." (*Id.*)  Counsel for the City further explained that "the [s]ubpoena amounts to an improper fishing expedition lacking any legitimate investigatory purpose" and that "[b]ased on the slimmest and vaguest of pretexts, it demands that the City identify potentially thousands of its residents holding legitimate expectations of privacy," which is "little different than picking a particular neighborhood in the Bronx or Manhattan and demanding that the City provide a list of every person residing in that neighborhood based on the general allegation that unspecified crimes have been committed there." (*Id.*)

In response to these objections, ICE offered no rebuttal or even a response.  Instead, on August 22, 2025, ICE informed counsel for the City that it had rescinded the August 6 subpoena and issued a new subpoena.  (*Id.* Ex. 9.)

## IV.    THE AUGUST 22 SUBPOENA AND ITS SUBSEQUENT ABANDONMENT

On August 22, as noted above, the government issued yet another new subpoena.  While the Petition refers to that subpoena as the "Original Subpoena," that label, as the above procedural history makes clear, is inaccurate.  In apparent reaction to the City's objections to the August 6 subpoena, the August 22 subpoena took a different approach.  First, it narrowed its demand to just one of the two shelters that had been the subject of the August 6 subpoena: the Bruckner Shelter.

Second, rather than demand a list of all non-citizen males, the August 22 subpoena demanded the name and date of birth of all male residents who (a) were not citizens or nationals of the United States and (b) who "retaine[ed] criminal histories, irrespective of disposition, relative to" a list of eight crimes running the gamut from murder to assault of a law enforcement officer. (*Id.* Ex. 9.)

As with the August 6 subpoena, however, the August 22 subpoena failed to identify any male resident who it suspected was not a citizen or national of the United States or who it suspected had committed one of the crimes listed. Nor did it articulate any basis for believing that the Bruckner Shelter housed such individuals. Notwithstanding the unreasonable burden that a response would have required (see below), the subpoena imposed a deadline of exactly one week: "8:00 AM" on August 29, 2025. (*Id.*)

The City objected to the subpoena on August 29, 2025 for multiple reasons. (*Id.* Ex. 10.) While ostensibly narrower than the August 6 subpoena, which had demanded the name and date of birth of *all* the shelter's male residents, the August 22 subpoena effectively required the City to conduct an internal investigation and report its conclusions back to the government. Unlike a typical—and appropriate—subpoena, which would simply request production of a well-defined list of pre-existing documents, compliance with the August 22 subpoena would require the City to conduct multiple investigative steps.

To begin with, the City would be required to investigate and determine which of the shelter's residents were "not citizens or nationals of the United States." Left unstated by the subpoena was how the City could or would conduct that investigation. Next, the City would also need to investigate and determine whether any of those non-citizen residents "retain[ed] criminal histories, irrespective of disposition, relative to" a list of eight crimes. (*Id.* Ex. 9.) This second exercise would pose multiple issues. First, the vague terms used by the subpoena were undefined,

leaving the City in the dark about what it meant, for example, to "retain" a "criminal histor[y]" "irrespective of disposition."  As the City pointed out in its letter to ICE, the term "criminal histories" alone could be read to encompass a broad range of conduct ranging from actual convictions to "minor or informal interactions with law enforcement, such as being stopped, questioned, or otherwise contacted by local law enforcement." (*Id.* Ex. 10.) Second, the subpoena would require *the City* to conduct this research when ICE—a federal law enforcement agency— itself had much better access to the relevant data.  For these and other reasons, the City argued that the subpoena was improper, effectively seeking "to conscript City officials as federal law enforcement officers." (*Id.*)

The City's objection led to an exchange of correspondence with the government, now represented by the U.S. Attorney's Office for the Southern District of New York (the "USAO"). On September 5, 2025, the USAO wrote that, while it disagreed with the City's objections, it would "clarify and narrow the scope" of the subpoena by its letter.  (*Id.* Ex. 11.)  In response, on September 19, counsel for the City pointed out that rather than narrow the subpoena's scope, the September 5 letter in fact had vastly broadened the information requested from the City.  (*Id.* Ex. 12.)  The government disagreed, although once again it made no effort to compel enforcement of the August 22 subpoena, either in its original form or as modified by its September 5 letter. Instead, as it had done with its August 6 subpoena, the government served yet another subpoena— the current Subpoena now before the Court.

## V.    THE CURRENT SUBPOENA, IN WHICH THE GOVERNMENT REVERTS TO THE FORM OF ITS RESCINDED AUGUST 6 SUBPOENA

The Subpoena that is the subject of the government's Petition was served on October 6, 2025.  (*Id.* Ex. 13.)  That Subpoena abandoned the approach the government had taken in its August 22 subpoena and September 5 clarification and effectively reverted to the form of its first

administrative subpoena: the August 6 subpoena that the government rescinded.  Where the August 6 subpoena had sought "the Full Name and Date of Birth" of all non-citizen males residing at the Bruckner Shelter and one other shelter, the October 6 subpoena sought records sufficient to identify "the Full Name and Date of Birth of all males" residing at the Bruckner Shelter.  The only material difference between the subpoenas—the request for a list of residents regardless of citizenship status—in fact made the October 6 subpoena even broader.  The government offered no explanation for why it was appropriate now to pursue a form of subpoena that it had previously rescinded.

The City, as it had with respect to the withdrawn August 6 subpoena, objected.  It wrote that ICE:

> has now issued three improper and unenforceable subpoenas seeking a broad census of individuals in certain City shelters.  This Subpoena bears a striking resemblance to the first of these [] improper [ICE] attempts—the subpoena issued on August 6, 2025 . . .
>
> In a letter dated August 11, 2025, we explained why the August 6 Subpoena was improper and unenforceable.  In response to that letter, [ICE] rescinded the subpoena.  The [current] Subpoena suffers from the same flaws we previously identified, and it is confusing why [ICE] is reissuing a defective subpoena two months after rescinding it.  As we have consistently informed [ICE], the City remains prepared to consider an appropriate subpoena.  For the reasons stated above and in our August 11 letter, however, the current Subpoena is improper and unenforceable.

(*Id.* Ex. 14.)  In response, the government filed this Petition on December 9, 2025.

## LEGAL STANDARD

"To win judicial enforcement of an administrative subpoena, the [agency] 'must show (1) that the investigation will be conducted pursuant to a legitimate purpose, (2) that the inquiry may be relevant to the purpose, (3) that the information sought is not already within the [agency's] possession, and (4) that the administrative steps required . . . have been followed . . . .'" *RNR*

*Enters., Inc. v. S.E.C.*, 122 F.3d 93, 96–97 (2d Cir. 1997) (quoting *United States v. Powell*, 379 U.S. 48, 57–58 (1964)).  Even if it satisfies those criteria, however, a subpoena will not be enforced if the opposing party "demonstrates that the subpoena is unreasonable or that compliance would be unnecessarily burdensome."  *E.E.O.C. v. United Parcel Serv., Inc.*, 587 F.3d 136, 139 (2d Cir. 2009) (quotation omitted).  Further, courts have long recognized that an administrative subpoena does not allow the government to conduct a fishing expedition.  *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1419 (D.C. Cir. 1994) ("'Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to . . . direct fishing expeditions into private papers on the possibility that they may disclose evidence of a crime.'") (quoting *Federal Trade Comm'n v. American Tobacco Co.*, 264 U.S. 298, 305–06 (1924)).

## ARGUMENT

### I.    THE SUBPOENA IS UNREASONABLE AND DISPROPORTIONATE TO ANY LEGITIMATE INVESTIGATIVE PURPOSE

The law does not grant an administrative agency "unfettered authority" to conduct a fishing expedition or to "cast about for potential wrongdoing."  *In re Sealed Case (Admin. Subpoena)*, 42 F.3d at 1418.  Yet that is precisely what this Subpoena attempts to do.

The Petition is devoid of any suggestion that any particular resident of the Bruckner Shelter has entered the United States illegally or committed a criminal or civil offense of any kind.  Though the government claims to be searching for individuals who "retain criminal histories"—without defining what that term means—the Petition fails to identify even a single individual who falls into that category.  Nor does it provide any basis to believe that such individuals reside in the Bruckner Shelter.  Instead, the government demands a list of *all* residents, in the apparent hope that it can use that list to conduct a separate post hoc investigation to determine whether one of

14

those residents violated the law.  The government's approach is akin to demanding that a City-run hospital turn over a list of all current patients in the hopes of identifying one that may have entered the country illegally.  It amounts to nothing more than a search for "other wrongdoing, as yet unknown" of the kind struck down by the Court in *In re Sealed Case (Admin. Subpoena)*, 42 F.3d at 1418.

The government knows how to issue a more narrowly targeted subpoena, and in fact has done so in this very matter.  In June 2025, ███████████████████████████ ████████████████████ the government served the City with a very different administrative subpoena.  (Jensen Decl. ¶ 8.)  That June 3 subpoena listed the names of seventy-nine individuals who ICE "believed to be subject to final orders of removal, have open warrants, or have been convicted of criminal offenses since unlawfully entering the United States," and sought information about each of them.  Although the City did not and does not concede the enforceability of the June 3 subpoena, in that instance, the City chose to provide a limited subset of the information sought.  Now, for reasons only it can explain (but are unexplained in the Petition), ICE has chosen to revert to the current blanket Subpoena.

The government's own conduct has effectively conceded the impropriety of its current approach.  On two separate occasions, ████████████████████████ █████████████████████████████████████████ █████████████████████████████████████████ █████████████████████████████████████████ █████████████████████████████████████████ █████████████████████████████████████████ █████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

Second, in its August 6 administrative subpoena, the government sought a list of "all males currently lodged or residing at" two City shelters, including the Bruckner Shelter, who were not citizens or nationals of the United States.  (*Id.* Ex. 7.)  The City objected to the subpoena as "an improper fishing expedition" that would require the City to "identify potentially thousands of its residents holding legitimate expectations of privacy."  (*Id.* Ex. 8.)  Unaware of "any legal basis for such a demand," the City nevertheless invited the government to provide such authority.  (*Id.*)  Once again, however, the government declined the invitation to justify its overbroad subpoena.  Instead, it withdrew the August 6 subpoena and issued a new one (the August 22 subpoena) which suffered from additional and different flaws.  (*Id.* Ex. 9.)

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

Rather than provide a particularized justification of the relevance of the information sought to a particularized law enforcement investigation, the Declaration of George Ioannidis, ECF No. 3 ("Ioannidis Decl.") relies on empty platitudes.  Such a showing is necessary to sustain the government's burden of proper purpose for the Subpoena.  *See In re Admin. Subpoena No. 25-1431-019*, No. 25-MC-91324-MJJ, 2025 WL 2607784, at *5 (D. Mass. Sept. 9, 2025) (quashing subpoena where "[t]he [g]overnment has not submitted any affidavits or other evidence to show proper purpose").  The government claims to be investigating violations of three statutes—Title 8 sections 1324 (harboring), 1325 (improper entry) and 1326 (illegal reentry)—but offers nothing

more than the general statement that responsive documents "may help" to prove a violation. (Ioannidis Decl. ¶ 5.)  Addressing each of those potential violations in turn, however, reveals the emptiness of this purported justification.

With respect to the alleged violation of Section 1324, the allegation of potential harboring is clearly a pretext.  Second Circuit precedent is clear that merely providing temporary housing to asylum seekers cannot give rise to harboring under Section 1324.  *United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013) ("The mere act of providing shelter to an alien, when done without intention to help prevent the alien's detection by immigration authorities or police, is thus not an offense under § 1324(a)(1)(A)(iii).").  The government offers no explanation—by way of affidavit or otherwise—of how a bare list of shelter residents could substantiate such a baseless harboring investigation.

Once that pretextual allegation is taken off the table, the government is left with its investigation of improper entry (Section 1325) and illegal reentry (Section 1326).  Yet the Ioannidis Declaration provides no particularized description of how a list of resident names would have any bearing on those topics.  A census-level list of the entire population of the Bruckner Shelter, standing alone, would not reveal whether any individual had entered or reentered the United States unlawfully, or whether any individual has a criminal history.  The Ioannidis Declaration claims that the resident list "may help" to prove a violation but fails to explain how. (Ioannidis Decl. ¶ 5.)  Even if such an explanation were provided, it would apply just as easily to a list of employees of a large corporation, a list of patients at a City-run hospital, or a list of the residents of an entire city block.  Thus, the Ioannidis Declaration fails to provide any meaningful or particularized support for the government's Petition.

The need for a particularized justification is highlighted not only by the caselaw, but also by the language of the statute which authorizes ICE to issue subpoenas.  Title 8, United States Code, Section 1225 gives ICE the power to subpoena documents or information "relating to the privilege of *any person* to enter, reenter, reside in, or pass through the United States or concerning *any matter* which is material and relevant to the enforcement of" Title 8 (emphasis added).  The references to "any person" and "any matter" suggest that Congress's focus was on particular persons and particular matters, not on blanket requests for census-level information.  Had Congress intended to authorize the latter, it would have explicitly described such a sweeping and consequential grant of authority.  *See In re Apple, Inc.*, 149 F. Supp. 3d 341, 363 (E.D.N.Y. 2016) (rejecting the government's attempt to compel Apple to unlock an iPhone where "the absence of any explicit statutory authority for the relief the government seeks cannot be attributed to a failure of legislators to consider such an enactment") (internal citations and quotations omitted).  It did not do so here.

Notwithstanding this lack of clear statutory authority, the government's conduct in this matter leaves little doubt that its ultimate goal is to obtain census-level information, not just for the residents of the Bruckner Shelter, but for a huge swath of City residents.  ██████████ ████████████████████████████████████████████████—as many people as reside in the entire city of Albany.[8]  (Jensen Decl. Ex. 5 at 4:16–20.)  While the government withdrew those subpoenas and has narrowed the current Subpoena to just one shelter, there is little chance it will stop there.  If this Subpoena is enforced, other subpoenas for other shelters will

---

[8]     *QuickFacts, Albany city, New York*, UNITED STATES CENSUS BUREAU, https://www.census.gov/quickfacts/fact/table/albanycitynewyork/COM100223 (last visited Jan. 2, 2026) (reporting an estimated population in Albany, NY of 101,317 as of July 1, 2024).

surely follow, and before long the City will have been compelled to divulge private information for many tens of thousands of its residents.

The sweep and breadth of the government's likely objective here suggest an effort, not to obtain information appropriately tailored to a law enforcement investigation of particular immigration law violations, but rather to leverage the federal administrative subpoena power to circumvent and undermine the City's sanctuary city laws.  Indeed, the government has filed an action to strike down those laws in separate litigation.  *United States v. City of New York et al.*, No. 25-CV-4084 (RER)(PK) (E.D.N.Y. 2025).[9]  In effect, then, the government's likely goal with this Subpoena, and the others likely to follow, is more political than investigatory—it seeks to undermine and circumvent the immigration policies chosen by the City's elected representatives.

Under similar circumstances, two district courts have recently quashed administrative subpoenas deemed overbroad and issued for improper political purposes.  In *In re Admin. Subpoena No. 25-1431-019*, the District of Massachusetts quashed a Department of Justice subpoena to Boston Children's Hospital seeking personnel files for approximately 2,000 employees, billing records, and patient records related to gender-affirming care.  The court found that the government failed to show a proper purpose for the subpoena.  2025 WL 2607784 at *7. The "true purpose of issuing the subpoena," the court found, is to "interfere with the Commonwealth of Massachusetts' right to protect [the medical care] within its borders, to harass and intimidate [the hospital]."  *Id.*

---

[9]      On July 24, 2025, the United States sued the City challenging several provisions of local law, referred to colloquially as "sanctuary city laws."  *See United States v. City of New York et al.*, 1:25-CV-04084 (RER)(PK), Compl., ECF No. 1 (Jul. 24, 2025).  These laws reflect the City's policy choice to limit the resources that it devotes to assist the federal government with immigration enforcement.  The City has moved to dismiss the government's complaint in its entirety.  The motion will be fully briefed on February 23, 2026.  *See id.*, Dec. 12, 2025 Order.

Similarly, in *Queerdoc, PLLC v. U.S. Dep't of Justice*, No. 25-MC-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025), the court quashed a Department of Justice subpoena to a small telehealth provider seeking fifteen categories of documents, including complete personnel files, patient identifying information, and medical records. Rather than to investigate specific violations of law, the court found the subpoena was issued for an improper purpose—"to intimidate and coerce providers into abandoning lawful medical care." *Id.* at *2. The court further found that the subpoena was a "fishing expedition" seeking to "rifle through thousands of patient records hoping to find something—*anything*—to justify its predetermined goal" of eliminating the targeted practice. *Id.* at *6 (emphasis in original).

The government's course of conduct here, beginning with the withdrawn City Grand Jury Subpoenas and extending to the current Subpoena, similarly suggests that its ultimate goal is more political than investigatory. Even if the government could cite a legitimate investigative purpose, the current Subpoena is overbroad, unreasonable, and disproportionate to any such purpose. While the government has demonstrated that it knows how to issue a more narrowly targeted subpoena, it has chosen with the current Subpoena to instead conduct a fishing expedition. That effort should be quashed.

## CONCLUSION

For the foregoing reasons, the City respectfully submits that the Court should decline to

enforce the Subpoena.

Dated: January 2, 2026
        New York, New York

Respectfully submitted,

SHER TREMONTE LLP

By:    _/s/ Douglas R. Jensen_____
       Douglas R. Jensen
       Alison Moe
       Courtney Gans
       Benjamin J. Shack Sackler
       90 Broad Street, 23rd Floor
       New York, NY 10004
       (212) 202-2600
       djensen@shertremonte.com
       amoe@shertremonte.com
       cgans@shertremonte.com
       bshacksackler@shertremonte.com

       _Attorneys for The City of New York_

## Certificate of Compliance

Pursuant to Local Civil Rule 7.1(c) and this Court's Individual Rules and Practices, the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Civil Rules and Individual Rules and Practices.  As measured by the word processing system used to prepare it, this memorandum contains 6,555 words.