USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____________
DATE FILED: 11/06/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

Petitioner,

vs. 25-mc-559 (LAK)

THE CITY OF NEW YORK,

Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION AND ORDER**
**GRANTING PETITION TO COMPEL**
**(REDACTED)**

Appearances:

Jeffrey Stuart Oestericher
JAMIE MCDONALD
UNITED STATES ATTORNEY
*Attorney for Petitioner*

Alison Moe
Benjamin Jared Shack Sackler
Douglas R. Jensen
SHER TREMONTE LLP
*Attorneys for Respondent*

LEWIS A. KAPLAN, *District Judge*.

The United States has moved to compel the enforcement of an administrative subpoena issued to the City of New York. The subpoena seeks a list of residents of a city-run homeless shelter, information that U.S. Immigration and Customs Enforcement ("ICE") claims is relevant to an investigation that it is conducting into whether any residents of that facility are subject to deportation. The City has not shown that producing this list would be unduly burdensome, and

the agency has consented to the appointment of a special master who will identify residents of the facility with certain serious criminal histories and provide only those names to the agency. Under the applicable case law, the Court therefore has no choice but to compel the subpoena's enforcement, as modified by the appointment and role of a special master.

## ***Background***

### *I. Factual History*

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

---

[1] [redacted]

[2] [redacted]

[3] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted] [redacted]

4 [redacted]

5 [redacted]

6 [redacted]

7 [redacted]

8 [redacted]

9 [redacted]

[redacted]

*B. Administrative Subpoenas*

On August 6, 2025, ICE served the City with an administrative subpoena seeking "[t]he Full Name and Date of Birth of all males currently lodged or residing at" two city-run shelters.[11] The City objected that the request was "an improper fishing expedition lacking any legitimate investigative purpose" and declined to produce the records.[12]

On August 22, 2025, ICE withdrew the August 6 subpoena and issued a new administrative subpoena that sought information regarding a subset of men at the Bruckner shelter at 825 East 141st Street in the Bronx.[13] It requested the name and date of birth of all men living at the facility who "are not citizens or nationals of the United States" and "retain criminal histories, irrespective of disposition," in any U.S. jurisdiction, "relative to" any of eight types of offenses, namely, murder, manslaughter, rape, robbery, assault, grand larceny, burglary, and assault of a law enforcement officer.[14] The City objected that the subpoena improperly would require the City to

---

10 [redacted]

11 Dkt 19-7 at 8.

12 Dkt 19-8 at 3.

13 Dkt 19-9 at 2, 8.

14 *Id.* at 8.

conduct a time-consuming and costly investigation on ICE's behalf "and then report the results."[15] The City again declined to comply.

On September 5, 2025, ICE altered the scope of the subpoena through a letter issued to the City by the U.S. Attorney's Office for the Southern District of New York. The amended subpoena sought the same underlying information but required the production only of "[r]ecords sufficient to identify" to identify the names and dates of birth of an non-citizens at the Bruckner shelter and "[r]ecords sufficient to reflect" the criminal histories of shelter residents with criminal histories of the character described in the August 22 subpoena.[16] The City objected that the amendment failed to narrow the subpoena and still would require the City to conduct an impermissibly broad and burdensome investigation.[17]

On October 6, 2025, ICE issued another new administrative subpoena – the one at issue in this litigation – that sought, in its entirety, the following:

> Records sufficient to identify the Full Name and Date of Birth of all males currently lodged or residing at 825 East 141st Street, Bronx, NY (the "Facility"), and all other records in the possession, custody, or control of the Facility that contain information that would assist in identifying the Full Name and Date of Birth of all males currently lodged or residing at the Facility.[18]

---

15 Dkt 19-10 at 2.

16 Dkt 19-11 at 2.

17 Dkt 19-12 at 2.

18 Dkt 19-13 at 6.

The City objected to this latest subpoena on the same grounds that it objected to the August 6 subpoena and, to date, has not complied.[19]

## *II. Procedural History*

The United States bought this action to compel enforcement of the October 6 subpoena and has submitted two affidavits by George Ioannidis, an Assistant Special Agent in Charge at the New York City field office of ICE's Homeland Security Investigations division.

In the first affidavit, Agent Ioannidis testified that the information sought by the subpoena was "relevant to a federal Title 8 investigation."[20] Specifically, he said the information would allow the government to determine whether individuals unlawfully present in the United States with serious criminal histories are being housed at the shelter, "which may help to prove violations of, among other things, Title 8, Sections 1324, 1325, 1326."[21] Those provisions relate to the illegal harboring of aliens and unlawful entry and re-entry into the United States.

In the second affidavit, Agent Ioannidis testified that he had reason to believe that the Bruckner facility was a shelter for migrants and that many of its residents were not citizens or nationals of the United States.[22] He asserted that ICE was aware of approximately 100 people who received their immigration mail at the shelter and of at least 20 people that had entered the country

---

19 Dkt 19-14 at 2-3.

20 Dkt 3 ¶ 5.

21 *Id.*

22 Dkt 32 ¶ 6.

illegally who listed the shelter as their residence.[23] He asserted further that ICE was aware of 12 people who listed the facility as their residence and who had been charged with one of the eight serious criminal offenses listed in the August 22 subpoena.[24] In addition to the statutory provisions cited in his first affidavit, Agent Ioannidis said the information requested by the subpoena could be relevant to proving violations of sections 1253 and 1306 of title 8 (relating to failing to depart the United States after an order of removal and failing to register, respectively) and section 1459 of title 19 (relating to reporting requirements).[25]

The Court heard oral argument on March 18, 2026. At that hearing, counsel for the United States explained that "the only information the government wants to receive" is a list of individuals residing at the shelter who "have a criminal history of those specific eight serious criminal offences," i.e., murder, manslaughter, rape, robbery, assault, grand larceny, burglary, and assault of a law enforcement officer.[26] Counsel said that the United States was "more than willing to be limited to that information," an outcome that could be accomplished through the appointment of a special master to search the criminal histories of the residents of the shelter.[27]

---

23 *Id.*

24 *Id.* ¶ 7.

25 *Id.* ¶ 8.

26 Dkt 41 at 4:14-16.

27 *Id.* at 6:22-23.

**Discussion**

ICE has statutory authority to require by subpoena the production of records "relating to the privilege of any person to enter, reenter, reside in, or pass through the United States" or "concerning any matter which is material and relevant to the enforcement of" the federal immigration laws.[28] If the target of such a subpoena neglects or refuses to respond, a United States district court may order that person to produce the records sought.[29]

To enforce an administrative subpoena by court order, "[a]n agency must show only [1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within [the agency's] possession, and [4] that the administrative steps required . . . have been followed."[30] If these showings are made, a court will enforce the subpoena "unless the party opposing enforcement demonstrates that the subpoena is unreasonable, or issued in bad faith or for other improper purposes, or that compliance would be *unnecessarily* burdensome."[10]

A district court's role in proceedings to enforce an administrative subpoena is "extremely limited."[9] An affidavit from a government official generally is sufficient to demonstrate

---

28 8 U.S.C. § 1225(d)(4)(A).

29 *Id.* § 1225(d)(4)(B).

30 *EEOC v. United Parcel Serv., Inc.*, 587 F.3d 136, 139 (2d Cir. 2009) (alterations in original) (quoting *NLRB v. Am. Med. Response, Inc.*, 438 F.3d 188, 192 (2d Cir. 2006)).

10 *NLRB*, 438 F.3d at 192-93 (quotation marks omitted) (quoting *RNR Enters., Inc. v. EEOC*, 122 F.3d 93, 97 (2d Cir. 1997)).

9 *In re McVane*, 44 F.3d 1127, 1135 (2d Cir. 1995) (*quoting NLRB v. C.C.C. Assoc., Inc.*, 306 F.2d 534, 538 (2d Cir. 1962)).

that the requirements for enforcement are met, and a court must defer to an agency's assessment of relevancy "so long as it is not obviously wrong."[10] Furthermore, the Second Circuit has "interpreted relevance broadly."[11]

The United States has made a showing sufficient to have the subpoena enforced. The subpoena seeks records not already within ICE's possession, and the required administrative steps have been followed.[12] Agent Ioannidis's affidavits establish that ICE is conducting an investigation within its statutory authority and that the subpoena seeks information relevant to that inquiry. ICE has the authority to investigate the offenses cited by Agent Ioannidis, including unlawful entry and re-entry into the United States. And records sufficient to identify the residents of a shelter serving a large number of immigrants, including several known to have entered the country without authorization, is not obviously irrelevant to that investigation. Furthermore, the United States has agreed to the use of procedures that would limit the information it receives to the names of individuals with serious criminal histories.

In these circumstances, the City must comply unless it shows that this otherwise valid subpoena was issued in bad faith or for other improper purposes, or that compliance with the subpoena would be unreasonably burdensome. It argues that ICE's request for "census-level" information amounts to an improper "fishing expedition."[13] Although the Supreme Court once

---

10 *Id.* at 1135-36 (quoting *Resolution Trust Corp. v. Walde*, 18 F.3d 943, 946 (D.C. Cir. 1994)); *see United States v. Stuart*, 489 U.S. 353, 360-61 (1989).

11 *In re McVane*, 44 F.3d at 1136.

12 Dkt 3 ¶¶ 4-7.

13 Dkt 35 at 17, 20.

"strongly condemned 'fishing expeditions into private papers on the possibility that they may disclose evidence of crime,'" the Court later "decisively abandoned" that position in favor of the view that an administrative agency has a power of inquisition akin to that of a grand jury, which it may exercise "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not."[14] Moreover, this subpoena targets a shelter known to house migrants, and the agency has agreed to limit its request to individuals with certain serious criminal histories. It is not akin to a request for "census-level" information of an entire city block.

The City argues also that ICE improperly is attempting to "leverage the federal administrative subpoena power to circumvent and undermine the City's sanctuary city laws," suggesting the agency's motive is "more political than investigatory."[15] This speculation is unsupported by the record. Although the City and the federal government do not see eye to eye on immigration policy,[16] nothing in the record sufficiently suggests that ICE is attempting to identify migrants with serious criminal histories for any reason other than to enforce the immigration laws against them. The circumstances that convinced the courts in *In re Administrative Subpoena No. 25-1431-019*[17] and *QueerDoc, PLLC v. U.S. Department of Justice*[18] that certain extremely broad

---

14 *In re McVane*, 44 F.3d at 1134-35 (first quoting *FTC v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924); and then quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950)).

15 Dkt 35 at 19.

16 *See, e.g.*, *id.* (noting the United States has sued the City to strike down its sanctuary city laws).

17 800 F. Supp. 3d 229 (D. Mass. 2025).

18 807 F. Supp. 3d 1295 (W.D. Wash. 2025), *rev'd*, 187 F.4th 1112 (9th Cir. 2026).

subpoenas were served to harass the receiving entities – rather than actually to enforce federal law – are not present here.

[redacted]

In light of the agency's consent to the use of a special master, and deferring to the agency's assessment that the records are relevant to its legitimate investigation, the Court thus concludes the subpoena concerns a matter which is material and relevant to the enforcement of the federal immigration laws.[19]

---

[19] *See* 8 U.S.C. § 1225(d)(4)(A).

***Conclusion***

The petition (Dkt 12) is granted to the extent that, within 14 days of the date of this order, the parties shall submit a proposed order directing the appointment and providing for the compensation of a special master to facilitate enforcement of the subpoena in the manner proposed by counsel for the United States at the March 18 hearing.

The Clerk shall file an unredacted version of this opinion under seal.

SO ORDERED.

Dated: November 6, 2026

Lewis A. Kaplan
United States District Judge